## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JACOB N. FERGUSON,                           :
                                             :
        Plaintiff,                           :        Civil Action No.:      21-02512 (RC)
                                             :
        v.                                   :        Re Document No.:       7
                                             :
ROBBIN M. OWEN,                              :
                                             :
        Defendant.                           :

### MEMORANDUM OPINION

#### GRANTING DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

There are two questions in this case.  The first is whether there can be a substantial burden under the Religious Freedom Restoration Act ("RFRA") when a government restriction of an individual's religiously motivated activity does not prevent the individual from fulfilling a central religious practice and provides the individual with alternative means of conducting the religiously motivated activity.  The second is whether the Court should extend the *Bivens* remedy to the First Amendment context for a denied demonstration permit application.  The answer to both questions is no.

Jacob N. Ferguson, proceeding *pro se*, brings a RFRA claim and a *Bivens* action against Robbin M. Owen, the Chief of the Division of Permits Management for the National Park Service ("NPS"), in her individual capacity for alleged deprivations of his right to religious free exercise under the First Amendment and RFRA arising from NPS's denial of his permit application for a 4-month long demonstration at the Lincoln Memorial in Washington D.C. in 2021.  Mr. Ferguson brings his lawsuit under RFRA, 42 U.S.C. § 2000bb *et seq*., and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Mr.

Ferguson seeks an unspecified amount of nominal, compensatory, and punitive damages and attorney's fees and costs from Ms. Owens.

## II.  FACTUAL BACKGROUND

Mr. Ferguson is a musician, a demonstrator, and a street performer.  Compl. ¶¶ 13, 54, 64, ECF No. 1-1.  Mr. Ferguson came to Washington "to prophesy in the heart of the nation's capital and convey a sincerely held religious belief in free exercise of religion."  *Id.* ¶ 47.  Since Mr. Ferguson's arrival in Washington, he has sought to hold musical demonstrations to "attract a crowd with music and convey a religious/political message."  *Id.* ¶¶ 13, 47.  Mr. Ferguson's decision to demonstrate in Washington has religious significance for him because D.C. "is the political subject of [his] religious message" and he believes "that great parallels can be drawn between the present time and that of the transition of Rome's government from republic to empire, before the coming of Christ."  *Id.* ¶ 93.

Mr. Ferguson also specifically wanted to demonstrate at the Lincoln Memorial Reflecting Pool area.  *Id.* ¶¶ 27–28, 93–96.  Mr. Ferguson had general religious motivations to reach a large audience to spread his religious message and to confront his fear of public speaking, as well as a particular religious motivation to demonstrate in the heart of the nation's capital, and the Lincoln Memorial Reflecting Pool area satisfied these religious criteria.  *Id.* ¶¶ 93–96.  But Mr. Ferguson, while presenting a religious reasoning for his choice of location, claiming that the Lincoln Memorial "represents the appropriate and symbolic epicenter for [his] religious/political message," *id.* ¶ 95, specifically disclaims the notion that his religious beliefs made demonstrating at the Lincoln Memorial a religious necessity, *id.* ¶ 96 (expressing Mr. Ferguson's belief that the location he selected "was acceptable to God"); *see also* Opp'n to Mot. to Dismiss ("Opp'n") at

17, ECF No. 9-1 ("Plaintiff did not *know* which site God wanted him to demonstrate at, or even if God was so pedantic at all.").

Mr. Ferguson has more than three years' worth of grievances against Ms. Owen, but this case concentrates on a single permit denial. *Id.* ¶¶ 11–12.  As a result of previous denials, Mr. Ferguson developed an increasingly sophisticated understanding of the regulations that govern the NPS permit application process, and he began to plan his musical demonstrations further and further in advance. *Id.* ¶ 4.  Mr. Ferguson's greater sophistication and planning, however, did not result in successful permit approvals, compounding his disappointments and frustrations, and leading to this lawsuit. *Id.* ¶¶ 74–82.  Mr. Ferguson has brought this suit *pro se*, having invested considerable time and energy in bringing the present case. *Id.* ¶ 74; Opp'n at 3.

The present controversy begins on April 9, 2020. *Id.* ¶ 18.[1]  On April 9, 2020, Mr. Ferguson submitted an application to demonstrate from April 9 through August 9, 2021, at the Lincoln Memorial Reflecting Pool area. *Id.* ¶ 18.  NPS uses a first-come, first served system to issue permits. Compl. ¶ 20; *see also* 36 C.F.R. § 7.96(g)(4)(i) ("NPS processes permit applications for demonstrations and special events in order of receipt . . . . Use of a particular area is allocated in order of receipt of fully executed applications, subject to the limitations in this section.").  One year is the maximum amount of time that an applicant can apply in advance. Compl. ¶ 20; *see also* 36 C.F.R. § 7.96(g)(4)(i) ("NPS will not accept applications more than one year in advance of a proposed continuous event (including set-up time, if any).").  And yet, despite applying exactly one year in advance for 123 dates at the Lincoln Memorial Reflecting

---

[1] Because the Court is considering a Rule 12(b)(6) motion to dismiss, the Court presumes that "all [the] factual allegations in [Mr. Ferguson's] complaint are true . . . ." *KBI Transp. Servs. v. Med. Transp. Mgmt., Inc.*, 679 F. Supp. 2d 104, 107 (D.D.C. 2010).

Pool area, NPS issued Mr. Ferguson zero permits to demonstrate at that location.  Compl. ¶ 28.[2]

Mr. Ferguson speculates that NPS denied his applications because of religious prejudice, but he

admits that he has no evidence for this claim.  Compl. ¶¶ 42–44.

 After Ms. Owen correctly filed Mr. Ferguson's application, she still refused to grant Mr.

Ferguson any dates to demonstrate at the Lincoln Memorial Reflecting Pool area, claiming that

other applicants had filed before him.  *Id.* ¶ 28.  Mr. Ferguson monitored the Reflecting Pool and

did not see any demonstrations on several of the dates that NPS denied his application.  Compl.

¶¶ 29–30.  He alerted Ms. Owen of this observation.  *Id.* ¶ 31.  Ms. Owen responded that the

approved permit applicants must have failed to appear on those dates.  *Id.*  Mr. Ferguson alleges

that, despite Ms. Owen's assertion to him of the contrary, there were no other applicants on some

of the dates that he requested.  *Id.* ¶¶ 29–31.

 Mr. Ferguson sought redress through several channels.  Mr. Ferguson tried to call Deputy

Superintendent Sean Kennealy but was unable to reach him.  Compl. ¶ 32.  He reached out to

Congresswoman Eleanor Holmes Norton, who sent multiple inquiries to NPS on his behalf.  *Id.*

¶ 34.  He filed a complaint with the NPS Office of Professional Responsibility and a separate

complaint with the Inspector General of the U.S. Department of the Interior, but both declined to

pursue further action.  *Id.* ¶ 34.  He submitted a Freedom of Information Act request, but he did

not receive any information from it.[3]  *Id.* ¶ 35.

---

[2] NPS clearly reserves the Lincoln Memorial Reflecting Pool area for three weeks in late June and early July for the annual Fourth of July Celebration, so the denial of his applications for those three weeks needs no further explanation.  36 C.F.R. § 7.96(g)(4)(ii)(C); *see also* Owen Decl. ¶ 16, ECF No. 7-2.

[3] Mr. Ferguson has not raised a Freedom of Information Act claim in the present action, and so the Court does not address it.

On May 21, 2021, Mr. Ferguson filed a petition for a writ of mandamus in District of Columbia District Court, requesting that the court immediately order NPS to issue him "a public gathering permit to conduct 1st Amendment demonstrations on the lower plaza of the Lincoln Memorial" on the dates requested by his April 9, 2020, application. Pet. for Writ of Mandamus, *Ferguson v. National Park Service*, Civ. A. No. 21-1425 (D.D.C. Sept. 9, 2021), ECF No. 1-1; Compl. ¶ 36. On June 9, 2021, the court informed Mr. Ferguson that he had not filed a proposed summons. Min. Order, *Ferguson*, Civ. A. No. 21-1425, ECF No. 4 (June 9, 2021). On June 17, 2021, the court electronically issued a summons to NPS. Summons, *Ferguson*, Civ. A. No. 21-1425, ECF No. 5. On July 6, 2021, Mr. Ferguson filed an amended petition for a writ of mandamus. Am. Pet. for Writ of Mandamus, *Ferguson*, Civ. A. No. 21-1425, ECF No. 7. On August 30, NPS requested to move its deadline to respond to October 1, 2021, and the court granted the motion the next day. Mot. for Extension of Time, *Ferguson*, Civ. A. No. 21-1425, ECF No. 11; Ferguson Decl. ¶ 32, ECF No. 9-2. The permit application at issue had been for demonstrations from April 9 through August 9, 2021. Compl. ¶ 18. On September 8, 2021, Mr. Ferguson voluntarily dismissed the suit, August 9 having already passed without injunctive relief. Notice of Voluntary Dismissal, *Ferguson*, Civ. A. No. 21-1425, ECF No. 12.[4]

Mr. Ferguson has continued to seek NPS permits. While Mr. Ferguson has succeeded in receiving permits from NPS, he claims that NPS is not granting him the permits he wants. Ferguson Decl. ¶¶ 35–39. Mr. Ferguson and Ms. Owen have continued not to see eye to eye on the NPS permitting process and the regulations that govern it. *Id.* ¶ 40. Those disputes,

---

[4] According to Ms. Owen, "To the extent Plaintiff argues that his action was mooted by the end of his requested four-month demonstration, Plaintiff may have still had a viable claim to the extent the alleged First Amendment violation is capable of repetition yet evades review." Reply to Opp'n to Mot. to Dismiss at 8, ECF No. 11 (citing *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

however, which postdate the April 9, 2020, permit application, are not at issue in the present case.

On September 27, 2021, Mr. Ferguson filed a complaint against Ms. Owen, bringing a RFRA claim and a *Bivens* action against her in her individual capacity for alleged deprivations of his right to religious free exercise under the First Amendment and RFRA.  Compl. ¶¶ 83–116.  Ms. Owen moved to dismiss pursuant to Rule 12(b)(6).  Def.'s Mot. at 26.  Alternatively, Ms. Owen requested summary judgment.  *Id.*[5]

## III.  LEGAL STANDARD

In order to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "[A] Rule 12(b)(6) motion does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim."  *Coulibaly v. Kerry*, 213 F. Supp. 3d 93, 123 (D.D.C. 2016).  At the motion to dismiss stage, a court must assume the veracity of the complaint's factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009) ("[A] court must take the allegations as true, no matter how skeptical the court may be.").  A court need not, however, accept conclusory assertions or legal conclusions.  *Id.* at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The plaintiff meets the standard of facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

When a complaint is brought *pro se*, the court should construe the *pro se* plaintiff's pleadings liberally in determining whether to dismiss a complaint for failure to state a claim

---

[5] Because the Court is granting Ms. Owen's motion to dismiss, the Court has not considered Ms. Owen's alternative motion for summary judgment.

upon which relief can be granted.  *Taylor v. District of Columbia*, 606 F. Supp. 2d 93, 95

(D.D.C. 2009).  "[A] district court errs in failing to consider a *pro se* litigant's complaint in light

of all filings, including filings responsive to a motion to dismiss."  *Brown v. Whole Foods Mkt.*

*Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015).  Complaints filed by *pro se* litigants "must be

held to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*,

551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), but *pro se* litigants

still "must present a claim on which the [c]ourt can grant relief."  *Belton v. Shinseki*, 637 F.

Supp. 2d 20, 23 (D.D.C. 2009) (quoting *Chandler v. Roche*, 215 F. Supp. 2d 166, 168 (D.D.C.

2002)).  The Court must be careful to avoid reading *pro se* complaints too liberally, placing itself

"more in the role of advocate than judge and . . . denying the defendant fair notice and an

opportunity to respond to identifiable allegations of wrongdoing."  *Nichols v. Vilsack*, No.  13-

cv-01502, 2015 WL 9581799, at *1 (D.D.C. Dec. 30, 2015).

## IV.  ANALYSIS

As noted above, Mr. Ferguson brings claims against Ms. Owen in her individual capacity

for money damages for an alleged deprivation of his religious free exercise under RFRA and free

speech and free exercise under *Bivens*.  The Court addresses the claims in the order they appear

in the Complaint.[6]

---

[6] Mr. Ferguson makes scattered reference to "intentional tort," Compl. ¶¶ 7, 41, 111, but it appears that these references are elements of his *Bivens* claim and not indications that he is bringing a standalone tort claim, *id.* ¶ 111 (referring to "a federal official knowingly commit[ting] an intentional tort" as part of his *Bivens* argument).  If Mr. Ferguson did intend to bring a standalone tort claim separate from his RFRA and *Bivens* claims, it is not clear what tort action he intended to bring, nor whether he exhausted his administrative remedies as required by the Federal Tort Claims Act ("FTCA").  *See* 28 U.S.C. § 2675(a); *Edwards v. District of Columbia*, 616 F. Supp. 2d 112, 116 (D.D.C. 2009) ("In order to bring suit under the FTCA, a claimant must first exhaust his or her administrative remedies.").  Accordingly, the Court has considered Mr. Ferguson's RFRA and *Bivens* claims and has not considered a standalone tort claim.

### A.  RFRA

Congress enacted RFRA to provide broad protections for religious exercise.  RFRA

"provide[s] greater protection for religious exercise than is available under the First

Amendment."  *Holt v. Hobbs*, 574 U.S. 352, 357 (2015).  RFRA guarantees that the federal

"Government shall not substantially burden a person's exercise of religion even if the burden

results from a rule of general applicability" unless "it demonstrates that application of the

burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least

restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-

1(a)–(b); *City of Boerne v. Flores*, 521 U.S. 507 (1997) (holding that RFRA cannot

constitutionally constrain state and local governments).  "A challenger under RFRA has the

initial burden of showing that the Government's conduct 'substantially burdens his religious

exercise.'"  *Mahoney v. U.S. Capitol Police Bd.*, No. CV 21-2314, 2022 WL 523009, at *10

(D.D.C. Feb. 22, 2022) (quoting *Holt*, 574 U.S. at 361 (discussing burden under the analogous

Religious Land Use and Institutionalized Persons Act)).

Showing a substantial burden is an essential component of a RFRA claim.  "Whether a

government action substantially burdens a plaintiff's religious exercise is a question of law for a

court to decide."  *Sabra v. Pompeo*, 453 F. Supp. 3d 291, 328 (D.D.C. 2020) (quoting *Singh v.

McHugh*, 109 F. Supp. 3d 72, 82 (D.D.C. 2016)).  RFRA does not define substantial burden, but

courts have explained its contours.  A "regulation [that] forces [individuals] to engage in conduct

that their religion forbids or . . . prevents them from engaging in conduct their religion requires"

can constitute a substantial burden.  *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001);

*see also Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) (holding that a substantial burden

must prevent the adherent "from engaging in conduct or having a religious experience which the

faith mandates" and must be "an interference with a tenet or belief that is central to religious

doctrine" (quoting *Graham v. Commissioner*, 822 F.2d 844, 850–51 (9th Cir. 1987)).  "A

'substantial burden' exists when government action rises above *de minimis* inconveniences and

puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"

*Roman Catholic Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 35 (D.D.C. 2021) (quoting

*Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008)).

The D.C. Circuit has held that a substantial burden requires more than government

restriction of religiously motivated conduct.  *Henderson* explicitly rejected "whether the

governmental restriction forced 'adherents of a religion to refrain from religiously motivated

conduct'" as the test for a substantial burden under RFRA.  253 F.3d at 17 (quoting *Mack v.

O'Leary*, 80 F.3d 1175, 1178 (7th Cir. 1996)).  Instead, *Henderson* endorsed "a narrower

test[:] . . . whether 'the government has placed a substantial burden on the observation of a

central religious belief or practice and, if so, whether a compelling governmental interest justifies

the burden.'"  *Id.* (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 384–

85 (1990)).  The difference between "religiously motivated conduct" and "the observation of a

central religious belief or practice" is important.  *See id.*  As the *Henderson* court explained,

"[o]ne can conceive of many activities that are not central or even important to a religion, but

nevertheless might be religiously motivated."  *Id.*  Congress only intended RFRA's compelling

interest requirement to be triggered by a substantial burden, and "[t]o make religious motivation

the critical focus is . . . to read out of RFRA the condition that only substantial burdens on the

exercise of religion trigger the compelling interest requirement."  *Id.*

The restriction of one—among several—means of fulfilling a central religious belief does

not rise to the level of a substantial burden.  In *Henderson*, the D.C. Circuit found that a "ban on

selling t-shirts on the Mall [did not] 'substantially burden' plaintiffs' exercise of their religion[.]"
*Id.* at 16.  While proselytizing was a central religious belief for the plaintiffs, selling t-shirts on
the Mall was not; no central religious belief of the plaintiffs prevented them from proselytizing
by giving away t-shirts on the Mall or, alternatively, selling t-shirts at another nearby location.
*Id.*; *see also Mahoney v. U.S. Capitol Police Bd.*, 2022 WL 523009, at *11 (ruling that although
plaintiff "felt called by God to hold the September 11th prayer vigil on the Western Front
Lawn," the refusal to allow an audience of twenty or more was not a substantial burden under
RFRA because he had "not alleged that his sincerely held religious belief required him to
conduct his September 11 vigil with more than 19 people" (citation omitted)).  Selling t-shirts on
the Mall and having a prayer vigil with more than 19 people on the Western Front Lawn were
both expressions of sincerely held religious beliefs, but neither were protected by RFRA.
*Henderson*, 253 F.3d at 16; *Mahoney v. U.S. Capitol Police Bd.*, 2022 WL 523009, at *11.
While proselytizing and holding prayer vigils can be practices central to religious belief
protected by RFRA, it does not follow that every government restriction on proselytizing and
holding prayer vigils is a substantial burden.  Rather, there is only a substantial burden when the
government restriction prevents an action that is central to religious belief.  *Henderson*, 253 F.3d
at 17.  When the plaintiffs do not allege that the restricted action was central to a religious belief,
there can be no substantial burden.  *Id.*

Mr. Ferguson had both religious and practical reasons for demonstrating at the Lincoln
Memorial.  Mr. Ferguson explains that he "chose the *place*, the Reflecting Pool steps of the
Lincoln Memorial in Washington, D.C., for a few reasons."  Compl. ¶ 93.  First, he chose D.C.
because "Washington, D.C., is the political subject of [his] religious message."  *Id.*  Second, he
"chose the Reflecting Pool steps because it resembles an amphitheatre," and people can

conveniently gather and watch his demonstration there.  *Id.* ¶ 94.  Third, he "chose the Lincoln

Memorial because it is the #1 most heavily trafficked and international tourist destination in the

nation's capital . . . therefore . . . represent[ing] the appropriate and symbolic epicenter for [his]

religious/political message . . . ."  *Id.* ¶ 95.  Fourth, "because [Mr. Ferguson] knows his greatest

fear is speaking in front of people" and because "the Lincoln Memorial consistently attracts the

largest crowds of people in Washington, D.C.," Mr. Ferguson believed his choice of the Lincoln

Memorial "was acceptable to God, '[f]or God has not given us a spirit of fear' (quoting 2

*Timothy* 1:7)."  *Id.* ¶ 96.

Religious demonstrations are central to Mr. Ferguson's religious beliefs.  Mr. Ferguson is

clear that a "central tenet of Christianity is called prophecy," and he came to Washington "to

prophesy in the heart of the nation's capital . . . ."  *Id.* ¶¶ 46–47.  This Court does not question

the sincerity or religious nature of Mr. Ferguson's call "to prophesy in the heart of the nation's

capital and convey a sincerely held religious belief in free exercise of religion," and RFRA

protects Mr. Ferguson's right to do so regardless of whether prophecy is a "central tenet of

Christianity."  *Id.* ¶ 46; *see Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 293–94

(D.D.C. 2020) ("RFRA defines 'religious exercise' to include 'any exercise of religion, whether

or not compelled by, or central to, a system of religious belief.'" (citing U.S.C. §§ 2000bb-2(4),

2000cc-5(7))); *Levitan v. Ashcroft,* 281 F.3d 1313, 1320 (D.C. Cir. 2002) ("The litigant's beliefs

must be sincere and the practices at issue must be of a religious nature." (citing *Church of the

Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993))).  But nowhere in Mr.

Ferguson's Complaint does he suggest that prophesying at the Lincoln Memorial is a "central

tenet" of his belief rather than merely a means of prophesying that he believed "was acceptable

to God."  Compl. ¶¶ 46, 96.

Mr. Ferguson explicitly *disclaims* the possibility that demonstrating at the Lincoln Memorial Reflecting Pool area was central to his religious belief.  In his Complaint, Mr. Ferguson claims that the Lincoln Memorial "was [religiously] acceptable" rather than claiming it was central to his religious belief.  *Id.* ¶ 96.  Mr. Ferguson explicates the meaning of this claim in greater detail in his Opposition.  Mr. Ferguson explains:

> Plaintiff did not know which site God wanted him to demonstrate at, or even if God was so pedantic at all. Plaintiff chose carefully the words of his complaint, kicking around the sentence many times (foreseeing Defendant's argument) before invariably giving up and settling once again upon the truth. The Lincoln Memorial was chosen because Plaintiff "believed it was *acceptable* to God[]" . . . . God did not command or *require* Plaintiff to choose the Lincoln Memorial (though Plaintiff prayed about it many times actually).

Opp'n at 17 (quoting Compl. ¶ 96).  RFRA does not protect all actions that are religiously *acceptable*; rather, RFRA protects only "the observation of a *central* religious belief or practice." *See Henderson*, 253 F.3d at 17 (emphasis added) (citation omitted).  Mr. Ferguson's explicit disavowal of the very claim he would need to make for his RFRA claim to be successful means his RFRA claim cannot succeed.

Even accepting that prophesying in the heart of the nation's capital was central to Mr. Ferguson's religious belief, Mr. Ferguson's RFRA claim still fails.  Mr. Ferguson concedes that Ms. Owen offered him a permit for "Korean War Veterans Memorial Site #6A."  Compl. ¶ 27. Mr. Ferguson had a religious motivation "to prophesy in the heart of the nation's capital."  *Id.* ¶ 47.  Both the Reflecting Pool and the Korean War Veteran Memorial are located in the heart of the nation's capital on heavily trafficked public land, so both should have satisfied Mr. Ferguson's religiously motivated desire to demonstrate in Washington and reach an audience with his religious message.  Mr. Ferguson found the Korean War Veteran Memorial unsatisfactory because it is "awkwardly detached from the people and logistically impractical for a large setup of music equipment."  *Id.* ¶ 27.  These complaints are practical, not religious.

Moreover, Mr. Ferguson did not believe that the Lincoln Memorial was the only suitable location to conduct his demonstrations, and he conducted demonstrations at other locations in D.C.  *See* Ferguson Decl. ¶ 12 (noting that Mr. Ferguson conducted his "first ever musical demonstration in Washington, DC, . . . [in] 2018, outside the United States Capitol Building" after receiving the appropriate permits from "the United States Capitol Police and White House Metropolitan Police Department," and Mr. Ferguson also "was able to successfully conduct First Amendment musical demonstrations front and center outside of the White House on the closed portion of Pennsylvania Avenue NW").  RFRA protects religious free exercise, but RFRA does not protect the practically motivated choice of a specific location, even if the location is used for a religiously motivated activity.  *See Henderson*, 253 F.3d at 17.

RFRA is only triggered when "the government has placed a substantial burden on the observation of a central religious belief or practice . . . ."  *Id.* (quoting *Jimmy Swaggart Ministries*, 493 U.S. at 384).  Mr. Ferguson appears to reject this holding.  He rhetorically asks, "Must one have religious beef with Abraham Lincoln in order to prophesy at his memorial?"  Opp'n at 18.  The essence of Mr. Ferguson's rhetorical question, applied to this case, is this: Must an individual have a central religious belief that requires demonstrating at the Lincoln Memorial in order for the denial of permit applications to demonstrate at the Lincoln Memorial—accompanied by the approval of permit applications to demonstrate at nearby locations—to constitute a substantial burden under RFRA?  The answer to this question is yes.

Mr. Ferguson appears to be confusing the substantial burden analysis under RFRA with general First Amendment protections.  Everyone has a First Amendment right to demonstrate, and everyone may apply for a permit to demonstrate at the Lincoln Memorial.  But the denial of a permit application to demonstrate at the Lincoln Memorial is a substantial burden under RFRA

only if demonstrating at the Lincoln Memorial is a central religious belief or practice.  RFRA

"provide[s] greater protection for religious exercise than is available under the First

Amendment," *Holt*, 574 U.S. at 357, but RFRA is only triggered upon the showing of a

substantial burden, *Henderson*, 253 F.3d at 17.

The availability of alternative means of fulfilling religious obligations also cautions

against the finding of a substantial burden.  The *Henderson* court reasoned that "[b]ecause the

Park Service's ban on sales on the Mall is at most a restriction on one of a multitude of means, it

is not a substantial burden on their vocation."  *Henderson*, 253 F.3d at 17 ("Plaintiffs can still

distribute t-shirts for free on the Mall, or sell them on streets surrounding the Mall.").  Similarly,

in *Mahoney v. Doe*, the D.C. Circuit held that a prohibition on sidewalk chalking in front of the

White House was not a substantial burden under RFRA because the plaintiff "may still spread

his message through picketing, a public prayer vigil, or other similar activities in which he has

previously engaged," as well as "chalking elsewhere."  642 F.3d 1112, 1121 (2011).  When a

government action only forecloses one of many ways an individual may engage in religiously

required conduct, there is no substantial burden.

Mr. Ferguson argues that the existence of alternative means of demonstrating should not

affect his RFRA claims.  *See* Opp'n at 38 (first citing *Mahoney v. Babbitt*, 105 F.3d 1452, 1459

(D.C. Cir. 1997); and then citing *United States v. Grace*, 461 U.S. 171, 177 (1983)).  The cases

that Mr. Ferguson cites arise in the context of the First Amendment, and they do not apply to

RFRA.  The government may not impermissibly deny an individual the use of one forum solely

because other fora are available.  *See Mahoney v. Babbitt*, 105 F.3d at 1459 ("[There is] no

authority for the proposition that the government may choose for a First Amendment actor what

public forums it will use.").  In "'public places' historically associated with the free exercise of

expressive activities . . . the government's ability to permissibly restrict expressive conduct is

very limited . . . ."  *Grace*, 461 U.S. at 177 (quoting *Perry Educ. Ass'n v. Perry Local Educators'*

*Ass'n*, 460 U.S. 37, 45 (1983)).

But court holdings on the importance of alternative channels of communication in the

First Amendment context have no bearing on this case.  The desire to demonstrate in a particular

time or place is protected by the First Amendment.  *See Grace*, 461 U.S. at 180 (holding that a

statutory prohibition on picketing on a sidewalk outside the United States Supreme Court

building was unconstitutional even though "there [were] sufficient alternative areas within the

relevant forum [to protest], such as the streets around the Court or the sidewalks across those

streets").  In the RFRA context, unlike the First Amendment, the availability of alternative

channels suggests that there has not been a substantial burden, preventing RFRA from being

triggered in the first place.  *Compare Henderson*, 253 F.3d at 17 ("Because the . . . [prohibition]

. . . is at most a restriction on one of a multitude of means, it is not a substantial burden on their

vocation."), *with Mahoney v. Babbitt*, 105 F.3d at 1459 ("[There is] no authority for the

proposition that the government may choose for a First Amendment actor what public forums it

will use."); *see also Weir v. Nix*, 114 F.3d 817 (8th Cir. 1997) (considering alternatives in

determining whether there was a substantial burden).  The existence of alternative means of

fulfilling a religiously motivated activity may be considered in determining whether there has

been a substantial burden on free exercise.

Mr. Ferguson also argues that his case is distinguishable from *Henderson* on the facts.

*See* Opp'n at 19.  Mr. Ferguson notes (1) that the *Henderson* court found it significant that no

"religious group [has] as one of its tenets selling t-shirts on the National Mall," *id.* (quoting

*Henderson*, 253 F.3d at 16); (2) that selling t-shirts was not "central" to the religious beliefs of

the litigants in that case, *id.* at 19–20 (quoting *Henderson*, 253 F.3d at 16), but prophecy is central to Mr. Ferguson's beliefs, *id.* at 20 (citing Compl. ¶¶ 46, 88); (3) that among the alternative channels available to the litigants in *Henderson* was distributing t-shirts on the Mall for free, Opp'n at 20 (citing *Henderson*, 253 F.3d at 17), and Mr. Ferguson did not plan to collect any donations at the Lincoln Memorial, *id.* (citing Compl. ¶¶ 10, 18, 60–61); and (4) that he would be opening himself up to government prosecution if he demonstrated at the Lincoln Memorial without a permit, Opp'n at 20.

None of these distinctions are legally significant. First, Mr. Ferguson has never claimed that music or prophecy *at the Lincoln Memorial* are central to his religious beliefs, and so Mr. Ferguson's case is like *Henderson* in this respect. Second, spreading a religious message was central to the religion of the litigants in *Henderson*, as it is for Mr. Ferguson, but just as spreading a religious message on the National Mall was not central to their beliefs, prophesying at the Lincoln Memorial is not central to Mr. Ferguson's. *Compare Henderson*, 253 F.3d at 17 ("[P]laintiffs have . . . alleged that it is their vocation to spread the gospel by 'all available means.'"), *with* Opp'n at 20 ("Plaintiff *has* alleged that prophecy is a central tenet of Christianity." (citing Compl. ¶¶ 46, 88)). Third, that the plaintiffs in *Henderson* sold t-shirts rather than distributing them for free was only important because the regulation at issue in that case prohibited selling but permitted distributing for free. 36 C.F.R. § 7.96(k)(2) (2019); *Henderson*, 253 F.3d at 14. The distinction between selling and giving has no general importance for RFRA and has no bearing on this case. The fourth distinction is not a difference at all, as the plaintiffs in *Henderson* were similarly subject to government prosecution for violating a government regulation.

Mr. Ferguson's case is also not analogous to recent cases holding that Covid rules that prevent in-person gatherings at houses of worship are a substantial burden under RFRA.  Two recent district court cases in the D.C. Circuit have overturned restrictions on in-person religious gatherings on RFRA grounds.  *Capitol Hill Baptist Church*, 496 F. Supp. at 296 (finding a substantial burden under RFRA because "[t]he District has not, as it contends, banned merely one 'method of worship,' but instead has foreclosed the Church's *only* method to exercise its belief in meeting together as a congregation, as its faith requires"); *Roman Catholic Archbishop of Wash.*, 531 F. Supp. 3d at 35–36 (reaching a similar holding).  A recent Supreme Court decision enjoined a New York restriction on in-person religious gatherings on First Amendment grounds.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020).  RFRA "covers the same types of rights as those protected under the Free Exercise Clause."  *Tyndale House Publrs., Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012) (citation omitted).

The plaintiffs in *Capitol Hill Baptist Church*, *Roman Catholic Archdiocese of Wash.*, and *Roman Catholic Diocese of Brooklyn* all claimed that in-person religious gathering was central to their religion, and the challenged government actions prevented them from gathering in person to perform their religious activities.  *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 291; *Roman Catholic Archbishop of Wash.*, 531 F. Supp. 3d at 35; *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 68.  "It is not the role of a court to tell religious believers what is and isn't important to their religion," *Roman Catholic Archbishop of Wash.*, 531 F. Supp. 3d at 36 (citation omitted), and this Court presumes that prophesying in the heart of Washington and publicly performing music are central to Mr. Ferguson's religion.  Mr. Ferguson's case might be analogous to these cases if the government prevented Mr. Ferguson from prophesying or performing music publicly anywhere in Washington.  As Mr. Ferguson concedes, however, that is not what happened, *see*

Compl. ¶ 27, thus his case is not analogous to the cases concerning in-person gatherings to worship.

For all of these reasons, Mr. Ferguson has no claim under RFRA.  Mr. Ferguson has not shown that his free exercise of religion was substantially burdened, so he has failed to state a cause of action.

### B.  *Bivens*

The Court now turns to Mr. Ferguson's *Bivens* claim.  There is a two-part test for deciding when implied damages under *Bivens* are recognized: "First, we must consider whether the plaintiff seeks to extend *Bivens* into a 'new context.'  If so, we then must consider whether there are any 'special factors counselling hesitation.'"  *Loumiet v. United States*, 948 F.3d 376, 381 (D.C. Cir. 2020) (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857–60 (2017)).  The Supreme Court conceives of "new context" broadly, encompassing any context "different in a meaningful way from previous *Bivens* cases decided by this Court."  *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (quoting *Abbasi*, 137 S. Ct. at 1859)).

Existing *Bivens* remedies are only applicable to an exceedingly narrow scope of claims. Currently, *Bivens* claims "are cognizable only in three, narrow factual contexts."  *Robinson v. Pilgram*, Civ. A. No. 20-cv-2965, 2021 WL 5987016, at *10 (D.D.C. Dec. 17, 2021) (citing *Abbasi*, 137 S. Ct. at 1860).  In *Bivens*, the context was a "claim against FBI agents for handcuffing a man in his own home without a warrant."  *Abbasi*, 137 S. Ct. at 1860.  In *Davis v. Passman*, 442 U.S. 228 (1979), the context was "a claim against a Congressman for firing his female secretary."  *Id.*  In *Carlson v. Green*, 446 U.S. 14 (1980), the context was a "claim against prison officials for failure to treat an inmate's asthma."  *Id.*  The Supreme Court "has 'consistently refused to extend *Bivens* to any new context or new category of defendants' . . . for

the past 30 years." *Abbasi*, 137 S. Ct. at 1857 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).

If a claim arises in a new context, a court must then "proceed to the second step and ask whether there are any 'special factors that counsel hesitation' about granting the extension." *Hernandez*, 140 S. Ct. at 743 (cleaned up) (quoting *Abbasi*, 137 S. Ct. at 1857)). If such factors are present, the court must reject the extension of *Bivens*. *Id.* The Supreme Court "ha[s] not attempted to 'create an exhaustive list' of factors that may provide a reason not to extend *Bivens*, but [the Court] ha[s] explained that 'central to [this] analysis' are 'separation-of-powers principles.'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1857). The court must "consider the risk of interfering with the authority of the other branches . . . ask[ing] whether 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy' . . . and 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed . . . .'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1858).

Courts have identified Congressional action as an important special factor. The existence of an "alternate remedial scheme" counsels against extending a *Bivens* remedy. *Pinson v. U.S. Dep't of Justice*, 514 F. Supp. 3d 232, 243 (D.D.C. 2021); *see also Abbasi*, 137 S. Ct. at 1858 ("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."). The alternate remedial scheme does not need to supply a remedy to an individual plaintiff. *Wilson v. Libby*, 535 F.3d 697, 709 (D.C. Cir. 2008) ("The special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue."). "Instead, the existence of an alternative scheme implies that 'congressional inaction' in declining to

provide a damages remedy 'has not been inadvertent,' so the Judiciary should not interfere."
*Pinson*, 514 F. Supp. 3d at 243 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)).  "[A]
comprehensive statutory scheme precludes a *Bivens* remedy even when the scheme provides the
plaintiff with 'no remedy whatsoever.'"  *Wilson*, 535 F.3d at 709 (quoting *Spagnola v. Mathis*,
859 F.2d 223, 228 (D.C. Cir. 1988)).  Relatedly, "Congress' activity in the field" is a special
factor counselling against extending *Bivens*.  *Chappell v. Wallace*, 462 U.S. 296, 304 (1983).
Applying these principles to Mr. Ferguson's claims makes clear that no *Bivens* remedy should be
recognized on these facts.

### 1.  Mr. Ferguson's *Bivens* Claims Arise in a New Context

Mr. Ferguson's First Amendment claims involve free speech and free exercise.  Mr.
Ferguson alleges that the government restricted his speech by arbitrarily denying him a permit at
the time and place he requested.  Compl. ¶ 114.  Mr. Ferguson also alleges that because of the
religious nature of his planned activities, the denial of the permits "deprived [him] of free
religious exercise . . . ."  *Id.* ¶ 115.  Mr. Ferguson and Ms. Owen agree that recognizing a *Bivens*
remedy in this case would be a "new context."  *Id.* at ¶ 106; Def's Mot. at 13.  They are correct.
"If the case is different in a meaningful way from previous *Bivens* cases decided by this Court,
then the context is new."  *Abbasi*, 137 S. Ct. at 1859.  When "the constitutional right at issue" is
different, the case is meaningfully different.  *Id.* at 1860.  The Supreme Court "ha[s] never held
that *Bivens* extends to First Amendment claims."  *Reichle v. Howards*, 566 U.S. 658, 663 n.4
(2012); *see also Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 30 (D.D.C. 2021) ("The
plaintiffs' First Amendment claim arises in a new context because the Supreme Court has never
extended *Bivens* to a claim brought under the First Amendment." (citing *Hernandez*, 140 S. Ct.
at 741)).

2.  Special Factors Weigh Against Extending *Bivens* to Mr. Ferguson's Claims

Separation of powers concerns are central to the "special factors" inquiry.  *See Hernandez*, 140 S. Ct. at 743.  In this case, there is an "alternate remedial scheme," *Pinson*, 514 F. Supp. 3d at 243, and congressional "action in the field," *Chappell*, 462 U.S. at 304.  While freedom of speech and free exercise are fundamental rights protected by the First Amendment, special factors counsel hesitation in judicially creating a damages remedy against federal officials who deny permit applications.  In cases like this one, courts are not "well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  *Abbasi*, 137 S. Ct. at 1858; *see also Storms v. Shinseki*, 319 F. Supp. 3d 348, 355 (D.D.C. 2018) ("Ultimately, in the complex, fraught arena of free speech, Congress is better suited than the Judiciary to determine whether a damages action should arise.").  The Court declines to expand *Bivens* to cover Mr. Ferguson's claims.

To the extent that Ms. Owen's actions may have impeded Mr. Ferguson's religious freedom, Congress has sought to protect free exercise, including with money damages against federal officials in their individual capacities, with RFRA.  42 U.S.C. § 2000bb *et seq*; *Tanvir v. Tanzin*, 889 F.3d 72, 76 (2d Cir. 2018) (ruling that RFRA permits litigants to obtain monetary damages against federal officials in their individual capacity).  When Congress "provide[s] meaningful safeguards" to protect the "[constitutional] rights," an extension of *Bivens* may be foreclosed.  *Chilicky*, 487 U.S. at 425.

Congressional "activity in the field" through RFRA also counsels against extending *Bivens*.  *Chappell*, 462 U.S. at 304.  That Mr. Ferguson has failed to state a claim under RFRA, as discussed above, does not affect the relevance of RFRA to the special factors analysis.  Insofar as RFRA does not provide relief to Mr. Ferguson, this lack of remedy suggests Congress's

intention to limit causes of action for monetary damages against federal officials. *Chilicky*, 487 U.S. at 414 ("[T]he courts must give appropriate deference to indications that congressional inaction has not been inadvertent, and should not create *Bivens* remedies when the design of a Government program suggests that Congress has provided what it considers to be adequate remedies for constitutional violations . . . ."). Given the extensive attention Congress has given to religious freedom, inadvertent neglect is unlikely. Because Congress has already acted, this Court should not interfere.

Furthermore, Mr. Ferguson could have sought—and did seek—equitable relief in the courts to enjoin the government to grant him a permit. Pet. for Writ of Mandamus, *Ferguson*, Civ. A. No. 21-1425, ECF No. 1-1; Def.'s Mot. at 16; Opp'n at 32–33. Mr. Ferguson did not receive the mandamus relief he requested because he voluntarily dismissed his action before it was considered on the merits. Notice of Voluntary Dismissal, *Ferguson*, Civ. A. No. 21-1425, ECF No. 12. Although Mr. Ferguson did not cite the Administrative Procedure Act ("APA") in either action, individuals who believe that NPS is acting in an arbitrary, capricious, unlawful, or unconstitutional manner can also sue under the APA. 5 U.S.C. §§ 706(2)(A)–(D); *see Henke v. DOI*, 842 F. Supp. 2d 54, 64 (D.D.C. 2012) ("If Plaintiffs believe NPS's future closure decision—should it occur—to be arbitrary and capricious, or otherwise unlawful or unconstitutional, they can challenge that decision under the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)–(D), at that time."); *Mausolf v. Babbitt*, 125 F.3d 661, 669 (8th Cir. 1997). Individuals convicted of violating NPS regulations can also raise the APA as a defense. *See United States v. Picciotto*, 875 F.2d 345, 349 (D.C. Cir. 1989) (reversing the conviction of the defendant demonstrator because the relevant NPS regulation was not adopted in conformity with the APA's procedural requirements).

According to Mr. Ferguson, an injunction could have provided him with only "partial relief," and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Opp'n at 32–33 (quoting *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 67). Mr. Ferguson's citation of *Roman Catholic Diocese of Brooklyn* is inapt for two reasons. First, the plaintiff in that case received injunctive relief, not money damages. *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 69. Second, *Abbasi* specifically recognizes "an injunction" and "some other form of equitable relief" as adequate alternative remedies. *Abbasi*, 137 S. Ct. at 1865 (2017). The Supreme Court has "refused to create a *Bivens* action even [when] it assumed a First Amendment violation and acknowledged that 'existing remedies do not provide complete relief for the plaintiff." *Chilicky*, 487 U.S. at 423 (quoting *Bush v. Lucas*, 462 U.S. 367, 388 (1983)). Lack of a path to seek "relief for injuries" is not sufficient to extend *Bivens*; it is enough for Congress to have provided for an "administrative . . . process." *Wilkie v. Robbins*, 551 U.S. 537, 553 (2007). The injunctive relief open to Mr. Ferguson, even if only promising partial relief, counsels against an extension of *Bivens*.

Mr. Ferguson also filed several administrative complaints, including with the NPS Office of Professional Responsibility. Compl. ¶ 34. "'Alternative remedial structures' can take many forms, including administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018). The existence of an administrative process to contest permit denials by the NPS represents an alternative remedial structure. The Supreme Court has recently made clear that agency regulations can also be the basis for an alternative remedial structure that forecloses a *Bivens* action. *Egbert v. Boule*, No. 21-147, 2022 WL 2056291, at *8–9 (U.S. June 8, 2022) (determining that a regulation requiring the Border Patrol

to accept grievances and investigate misconduct foreclosed a *Bivens* remedy because "[s]o long

as Congress *or the Executive* has created a remedial process that it finds sufficient to secure an

adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a

*Bivens* remedy" (emphasis added)).

 For all of these reasons, no *Bivens* cause of action exists for Mr. Ferguson's claim, and

under the analysis required by *Abbasi*, this Court should not create one.  *See Abbasi*, 137 S. Ct. at

1859.  The complaint therefore fails to state a claim upon which relief can be granted.[7]

* * *

 Mr. Ferguson's RFRA and *Bivens* claims for monetary damages are subject to dismissal.

The Court perceives, however, that Mr. Ferguson may have a claim for injunctive relief if his

allegations are correct that the NPS has not issued, and continues not to issue, permits to him in

conformity with the relevant regulations.  *See* Compl. ¶¶ 28–30 (citing 36 C.F.R. § 7.96)

(alleging that NPS did not process permit applications for demonstrations and special events in

order of receipt); 36 C.F.R. § 7.96(g)(4)(i) ("NPS processes permit applications for

demonstrations and special events in order of receipt.").

 This litigation is still in an early stage, so the Court will permit Mr. Ferguson to file for

leave to amend his complaint.  *See Tyson v. District of Columbia*, 20-cv-1450, 2021 WL 860263,

at *14 (D.D.C. Mar. 8, 2021) ("[G]iven the early stage in the litigation . . . the Court will allow

the Plaintiff to amend his complaint."); *Thomas v. District of Columbia*, No. 21-cv-00584, 2021

WL 5769443, at *3 (D.D.C. Dec. 6, 2021) (granting the motion to dismiss without prejudice and

"invit[ing] [the plaintiff] to file a motion for leave to file an amended complaint, attaching the

---

[7] Because Mr. Ferguson has failed to state a claim, there is no occasion to consider
whether Ms. Owens would be entitled to qualified immunity.

proposed amendment, within 30 days").  "The practice of freely giving leave to amend is particularly appropriate in the circumstance of *pro se* litigants."  *Kidd v. Howard Univ. Sch. of L.*, No. 06-cv-1853, 2007 WL 1821159, at *2 (D.D.C. June 25, 2007) (citing *Wyant v. Crittenden*, 113 F.2d 170, 175 (D.C. Cir. 1940)); *see also Moore v. Cap. Realty Grp., Inc.*, No. 21-cv-1099, 2022 WL 1049248, at *1 (W.D.N.Y. Apr. 7, 2022) ([G]iven his *pro se* status, [the plaintiff] may amend his complaint to allege, if possible, a viable claim . . . .").

Mr. Ferguson is proceeding *pro se*, so it is important that this Court inform him about the litigation process.  Mr. Ferguson "is advised that an amended complaint is intended to *completely replace* the prior complaint in the action and thus 'renders [any prior complaint] of no legal effect.'"  *Moore*, 2022 WL 1049248, at *1 (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) (advising a *pro se* plaintiff of the law surrounding amended complaints)); *see also Halldorson v. Sandi Grp.*, 934 F. Supp. 2d 147, 156 (D.D.C. 2013) ("It is hornbook law that an amended complaint supersedes the prior complaint and renders it of no legal effect.").  Any proposed amended complaint must include all allegations so that the amended complaint may stand alone.  Mr. Ferguson is also advised that "[a] motion for leave to file an amended pleading shall attach, as an exhibit, a copy of the proposed pleading as amended."  LCvR 15.1.  After receiving the motion for leave to file an amended pleading, the Court will determine whether to permit or deny the proposed amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[T]he grant or denial of an opportunity to amend is within the discretion of the District Court.").  This Court may deny the amendment as "futile if the amended complaint would not withstand a motion to dismiss."  *Hall & Assocs. v. Env't Prot. Agency*, 956 F.3d 621, 630 (D.C. Cir. 2020).

**V.  CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss (ECF No. 7) is **GRANTED**, and the complaint is **DISMISSED WITHOUT PREJUDICE**.  If the Plaintiff does not seek leave to file an amended complaint and accompanying motion within 30 days, the Court will dismiss the case with prejudice.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 8, 2022                                              RUDOLPH CONTRERAS
                                                                            United States District Judge